Mr. Chief Justice Johnson delivered the opinion of the Court. The form of the oath required to be administered to the grand jury is of ancient origin, and it is necessary that it should be observed, at least in substance; but the mode or order of administering it is purely a matter of practice, and must of necessity be governed by circumstances. The practice in England was to administer the entire oath first to the foreman, in the presence of his fellows, and then to call three of the others at a time, until the panel was completed, and swear them to keep and observe the same oath that their foreman had taken. The usual practice in this country is believed to be, first to administer the entire oath to the foreman, in the presence of his fellows, and then to call four of them at a time and require them to keep and observe the same oath that he has taken. It is conceived to be entirely a matter of practice as to the number that shall be sworn at a time, and that such practice is regulated alone by considerations of convenience. It might be considered, as a general rule, most convenient first to select the entire number necessaiy to constitute the panel and then to swear them in the presence of the foreman and of each other, yet we cannot perceive any good reason why a failure in this respect should have the effect to vitiate the panel, or that it would have any other operation than to impose upon the Court the necessity of seeing that the entire oath was administered to such of the jurors as were not present when their foreman was sworn. The record recites that the jurors who were added to the panel subsequently to the swearing of the foreman and such others as were then present and sworn, were “ duly empanneled, charged and sworn well and truly to inquire in and for the body of said county.” From the showing of record, the legal inference is that the entire oath was administered to them, which must necessarily have been the case if they were “duly sworn.” All that is said in respect to the swearing after the words “ duly sworn,” was mere surplusage, and as such will be rejected. We fully recognize the doctrine contended for by the appellant’s counsel with respect to the nature and extent of the construction, which the Courts are required to indulge in prosecutions under our gaming statutes. The section in reference to that matter most clearly works no change in the rules that previously prevailed in the construction of the indictment; but is exclusively confined to the question whether the case, as made by the proof, does or does not come within the statute. The 13th sec. ch. 51, Digest, declares that “the judges of the several courts in this State shall, in their construction of the statutes prohibiting gaming, construe the same liberally, with a view of preventing persons from evading the penalty of the law, by changings of the name or the invention of new names or devices, that now are, or may hereafter be brought into practice in any and in all kinds of gaming and all general terms of descriptions shall be so construed as to have effect and to include all such games and devices as are not specially named, and in all cases, when construction is necessary, it shall be in favor ef the prohibition and against the offender.” This Court, in the case of Drew vs. The State, (ante,) said : “ And although the mode of proceeding in the prosecution of the various offences created by the statute of gaming, is not within the sphere of that construction, when construction may be necessary, that is given to the courts and imposed upon them as a duty by the 13th section, there can be no doubt but that in the definition of the offences themselves this provision for construction has a legitimate place.” The section requiring a liberality of construction was not designed to enable the courts by a forced construction to bring offences within the act, which are not therein embraced, either by express words or by necessary implication; nor was it intended that an indictment should be sustained and upheld, unless it should clearly contain one of those offences. But it was manifestly designed alone to affect and to relax the rigor of those rules requiring a strict correspondence between the allegation and the proof. The evil of the old law, and the one at which this section was aimed, in one class of cases, was that upon an indictment of a party for any one of the offences 'enumerated in the statute, he would, when put upon his trial, evade the penalty by showing that, although the offence described was once known by the name given to it in the indictment, yet that such name had been changed, and that it was then known by another and different name, or by substituting some new name or device for the one described in the indictment. It was also designed as a further object in another class of cases, to confer upon the courts the power to decide when an offence not embraced in the enumeration, should be said to come within the scope of any one of the general terms of description. These are the only two classes of cases to which the liberal rule of construction was designed to be applied, and thus far it was deemed necessary to extend it in order to advance the remedy and to effectually suppress the mischief. According to this interpretation of the section under consideration, it is clear that the indictment in this case must be governed by the. ordinary and well established rules of construction, and that it is alone by those rules we are to determine whether the offence charged is embraced with the provisions of the statute. The first section, which is the one upon which the indictment was framed, declares that “ every person who shall set up, keep or exhibit any gaming tables or gambling devices, commonly called ABC, EO, roulette, rouge et noir, or any faro bank, or any other gambling table or gambling device, or bank of the like or similar kind, <$¿c., shall be deemed guilty of a misdemeanor,” &c. It is contended by the appellant’s counsel that, by the language adopted in the act, the legislature designed and have kept up a plain and marked distinction between those games embraced under the general description of gaming tables or gambling devices, and such as are included under the denomination of banks. This distinction is put upon the ground that, in the one class of cases the game derives it name from the peculiar structure of the table itself, and that in the other the idea of a table is not of necessity connected with, or in any manner dependent upon it. We have examined this notion in every phase that thought or reflection could suggest, and have ultimately been forced to the conclusion that it is not well founded. The argument, according to our understanding of it, is that, in the first class of offences in the enumeration, the entire motive power and machinery of the game consists in the table itself, and that in the latter the name and whole character of the game are directly derived from, and are wholly dependent upon the isolated idea of a bank as stripped from and disconnected with that of a table. The point here presented was incidently decided, and adversely to the position of the appellant, in the case of Drew vs. The State, already referred to. The Court, in that case, said, when laying down the distinction that exists between the games contemplated by the 1st and 8th sections of the act, that “the gist of the offence created by that section, which we are now considering, is the betting of money, or other thing of value, or the representative of any thing that may be esteemed of value, at, or upon that Ishmaelitish class of gambling devices and games of chance described and indicated in the 1st section of the act, which are to be distinguished from that -other class of small games described and indicated in the 8th section, not only by the general feature of supposed predominance of chance over skill, but also in the further general feature of being bank games or devices, against which banks or devices many may play for and against the money exhibited or understood to be in the bank, to be bet against and paid out by the conductor of the game or device, to those who may win on the chances.” If the construction in that case be correct, and that it is so we cannot entertain a doubt, there is no foundation left for the distinction attempted to be set up between the several games embraced within the lsi section of the act. But, to illustrate, let us suppose a party to be indicted, not for the exhibition of a faro bank, but simply for the exhibition of faro. Would not the ofFence created by the act be fully and completely described? We think it would. The term, “bank,” although used by the act, is not essential in order to a full description of the ofFence, nor is it necessary to convey to the mind a perfect and adequate idea of the game, and consequently it could not be required for the purpose of apprising the defendant of the nature of the charge preferred against him. The game of roulette, for example, is as much a bank game as that of faro, and yet the term “bank,” is not necessary in its description. We do not think that faro is so called simply because it has a bank attached to it, nor is it believed that roulette,' or rouge et noir, are so called from any peculiar structure or fashion of the table upon which they are exhibited. With these views, in regard to the characteristics of the several games embraced in the 1st section, we cannot concede the distinction contended for by the appellant. We are, therefore, of opinion that the description, as contained in the first count, is a substantial compliance with the statute, and that, therefore, it is all-sufficient to uphold and support a conviction. The second and third counts are essentially different from the first, and are substantially the same thing. The gist of the of-fence charged in those two counts, is the keeping, exhibiting and maintaining a certain common gaming table. The exhibition of a common gaming table, without any name, known or unknown to the jurors, is most clearly no offence within the purview of the statute. These two last counts are, therefore, manifestly bad, and, if they stood alone, would be wholly insufficient to uphold the verdict. This circumstance, however, cannot affect the validity of the indictment. In the case of Grant vs. Artle, (Doug. Rep. 703,) it was held that where there is a general verdict of guilty on an indictment consisting of several counts, if any one of them is good, it is sufficient. The same point was similarly ruled by the Supreme Court of New York in the case of The People vs. Cushing, (1 J. R. 323.) The Court below ruled correctly in sustaining the demurrer interposed to the defendant’s plea of former acquittal. This point is conclusively settled by the 242d sec. ch. 52, Dig. That section provides that “ when a defendant shall have been acquitted of a criminal charge, upon a trial, on the ground of a variance between the indictment and proof, or upon any exception to the form or substance of the indictment, he may be tried and convicted on a subsequent indictment for the same offence.” The acquittal set up as a bar to the present prosecution, was not the result of a trial upon the merits, but was merely a discharge from that prosecution in consequence of a defect in the indictment, and which defect was adjudged to exist upon an exception taken by demurrer. The objection in respect to the juror, Alexander Walker, is also untenable. The 159th section of the same chapter, declares that “No witness in a criminal case shall be sworn as a juror therein, if challenged for that cause before he is sworn; but this section shall not be so construed as to disqualify any person that may have been summoned by the defendant in order to disqualify him for a juror, if the person so summoned knows nothing of the case. This section is, in general terms, that no witness in a criminal case shall be sworn as a juror therein, if challenged for that cause before he is sworn, and then follows an exception in favor of the State, when the defendant shall attempt to deprive her of the benefit of the services of a juror, by summoning him as a witness, and that, too, when he knows nothing in relation to the charge exhibited against him. There is no exception in favor af the defendant in this respect, contained in the statute, and the presumption therefore arises that none was intended. The jury is summoned at the instance and under the authority of the State, and consequently the law could not presume that she would desire, without good cause, to set aside her own jurors. The state of case is totally different with the defendant. He has no agency in bringing in the persons who are to preside upon his case, but, being forced upon him, as it were, without his consent, he is presumed to have strong motives, in many instances, to set them aside, and more especially if he shall imagine that such juror would be inclined to, favor the side of the prosecution. There is doubtless another reason why the' statute is silent as to the defendant in this respect. It is that the Attorney General, being the accredited and chosen officer of the State, acting under all the solemnity of an official oath, and it being no less his duty to protect the innocent than to prosecute the guilty, the law will not countenance the idea for a moment that he could be so far lost to a proper sense of the duties imposed upon him by his station as to desire to' deprive the accused of any right that he might have under the law of the land. The next and last ground of objection relates to the sufficiency of the evidence to support the verdict and judgment. The State introduced but one witness who knew any thing in respect to the matter charged against the defendant. He testified, in substance, as follows : that, within a year next before the finding of the indictment, he went into a room kept by a Mr. Shaw, in Pulaski county, where he saw the defendant sitting behind a gaming table, commonly called a faro table, dealing cards ;.'that .there were several other persons at the table, who had checks, which they exchanged from one to another, and seemed to be betting, and that he understood the checks to represent money. He further stated, on cross-examination, that he did not certainly know that the checks stood for, or represented money, nor did he hear either of the players say that they stood for money, neither did he see any money paid on or for them, or in the redemption of them. He also stated that he was not acquainted with the game of faro, and could not say of his own knowledge that the persons at the table were playing faro, but that he had heard it called faro. He was then interrogated as to whether he had heard any one present at the game, or any one Since, when speaking of the game, call it faro, to which he responded, he had not. During his examination in chief, he made but a full and clear case in every particular against the accused, and we think there is nothing in his testimony, upon cross-examination, that can operate to weaken or affect the case thus made. It is true that he admitted that he was not acquainted with the game of faro, and further that he had not heard any one say that the particular game, about which he was testifying, was the game of faro. Nothing of this sort was necessary in order to satisfy the requisites of the statute. The legislature, in introducing the terms, “commonly called,” evidently designed to supersede the necessity of requiring the witness to explain and detail all the minutiae connected with the elements and principles of the game. This was one of the greatest evils of the old law, that, unless the witnesses called by the State were thoroughly conversant with all the minutiae of the game, the prosecution must necessarily fail, and it was to remedy this that they only required it should appear that the offence charged was so called by the community. It is, therefore, no matter what the game was called by those who played at it, or by ony other individual when speaking of the particular game, but it is all-suf.ficient for the purposes of the statute that it was commonly called faro. We are clear, therefore, from every view of the whole case, that there is no error in the verdict and judgment of the Court below. The judgment of the Circuit Court of Pulaski county, herein rendered, is, therefore, in all things, affirmed.